UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ELIZABETH SIMPSON,            )
                             )
v.                           )          NO. 3:11-0481
                             )
CAROLYN W. COLVIN,           )
        Acting Commissioner of    )
        Social Security[1]        )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the

final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's

claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as

provided by the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the

Commissioner's determination that the plaintiff is not disabled under the Act is not supported by

substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

for judgment on the administrative record (Docket Entry No. 9) should be GRANTED to the extent

that the case should be remanded to the ALJ.[2]

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

[2] Although the plaintiff has filed a reply and the defendant has filed a sur-reply (Docket Entry Nos. 12 and 15), the Court has not considered these filings to the extent that they pertain to matters

# I. INTRODUCTION

On July 25, 2006, the plaintiff filed applications for SSI and DIB, alleging a disability onset date of July 14, 2005, due to "[i]rregular heart beat, nerves, thyroid problems, and depression." (Tr. 80-82, 85-87, 107.)  Her applications were denied initially and upon reconsideration.  (Tr. 51-62.)  The plaintiff appeared and testified at a hearing before Administrative Law Judge ("ALJ") Phylis M. Pierce on April 13, 2009.  (Tr. 24-37.)  The ALJ issued an unfavorable decision on August 19, 2009 (tr. 15-23), and the plaintiff filed a request for review on September 4, 2009. (Tr. 175-76.)  On March 25, 2011, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4.)


# II. BACKGROUND

The plaintiff was born on June 28, 1972, and she was thirty-three years old as of her alleged disability onset date.  (Tr. 28, 80, 85.)  She has a twelfth grade education and has previously worked as a grocery cashier, restaurant cashier, and machine operator.  (Tr. 28-29, 107-08, 134-41.)  At the time of the hearing, she worked part-time as a grocery cashier.  (Tr. 29, 31.)


## A. Chronological Background: Procedural Developments and Medical Records

Dr. Harvey Bowles treated the plaintiff from May 11, 2006, through December 11, 2008. (Tr. 214-31, 277-82, 338-48.)  On May 11, 2006, the plaintiff presented to Dr. Bowles complaining

---

outside of the administrative record.

that she was "[b]ecoming depressed again," had "bad nerves," and "crie[d] a lot." (Tr. 218.) She reported having a history of depression, and a review of her symptoms revealed headaches, palpitations, mood swings, and weight gain. (Tr. 218-19.) Dr. Bowles diagnosed the plaintiff with tachyarrhythmia,[3] depression, edema, and "malaise/fatigue." (Tr. 220.) He ordered lab work and instructed the plaintiff to return for a follow-up examination in three weeks. *Id.*

The plaintiff returned to Dr. Bowles on June 5, 2006, reporting similar symptoms with the addition of night sweats. (Tr. 217.) Dr. Bowles noted that the plaintiff's lab results evidenced thyroid abnormalities, and during the examination, he also noted that her thyroid gland was enlarged. (Tr. 217, 229-30.) Dr. Bowles diagnosed the plaintiff with hyperthyroidism and tachyarrhythmia and prescribed Inderal.[4] (Tr. 217.) A thyroid scan on June 12, 2006, produced results "consistent with Graves' disease."[5] (Tr. 238.) On June 15, 2006, the plaintiff reported that she was feeling "ok" and was tolerating Inderal. (Tr. 216.) Upon examination, the plaintiff still had an enlarged thyroid gland, and Dr. Bowles diagnosed her with Graves' disease and hyperthyroidism. *Id.* The next day, the plaintiff underwent radioactive iodine therapy for hyperthyroidism. (Tr. 237.) During a follow-up visit with Dr. Bowles on August 3, 2006, the plaintiff reported feelings of irritability, isolation, poor concentration, occasional suicidal ideation, frightful and vivid dreams, and paranoid ideation.

---

[3] Tachyarrhythmia is "any disturbance of the heart rhythm in which the heart rate is abnormally increased, usually to greater than 100 beats per minute in an adult." Dorland's Illustrated Medical Dictionary 1850 (2003) ("Dorland's").

[4] Hyperthyroidism is "a condition caused by excessive production of iodinated thyroid hormones." Dorland's at 889. Inderal is an antihypertensive medication used to treat high blood pressure. Saunders Pharmaceutical Word Book 366 (2009) ("Saunders").

[5] Graves' disease is "a syndrome of diffuse hyperplasia of the thyroid . . . . [I]t usually has an autoimmune etiology and has been linked to autoimmune thyroiditis. Characteristics include hyperthyroidism." Dorland's at 534.

(Tr. 215.)  Dr. Bowles noted the plaintiff's depressed mood and sad affect, diagnosed her with "depression/anhedonia," and prescribed Effexor.[6]  *Id.*

Dr. Christopher Fletcher, a Tennessee Disability Determination Services ("DDS") non-examining consultative physician, reviewed the medical evidence related to the plaintiff's physical impairments on September 5, 2006, and concluded that her thyroid condition was a severe impairment but would improve to non-severe status within a year of treatment.  (Tr. 239-42.)

On September 21, 2006, DDS consultative examiner Dr. Deborah Doineau, Ed.D., completed a psychological examination of the plaintiff.  (Tr. 243-48.)  The plaintiff reported that she had experienced problems with depression "all [her] life" and had attempted suicide one year prior.  (Tr. 244-45.) She relayed having difficulty concentrating, low energy levels, and often feeling tired.  (Tr. 246.)  She reported that her medications reduced the severity of her "sad mood" and helped relieve her problems with poor sleep and nightmares.  (Tr. 244, 246.)  She recounted her daily activities to include taking care of her children, performing household chores, watching television, preparing meals, visiting family, helping her children with homework, looking after her personal needs, socializing with friends, attending church, going to the movies, and occasionally taking her children to football games.  (Tr. 246.)

Dr. Doineau reported that, during the examination, the plaintiff exhibited slow but clear and coherent speech; she was fully oriented; her memory was intact; her affect was "blunted;" and her mood was "mildly dysphoric." (Tr. 245.) Dr. Doineau found no evidence of psychosis or "loosening of associations, circumstantial, or tangential thinking," and the plaintiff did not report having

---

[6] Effexor is an antidepressant prescribed for major depressive disorder.  Saunders at 255.

4

hallucinations or delusions. *Id.* Dr. Doineau noted that the plaintiff's IQ appeared to be in the borderline range and that her insight "appeared to be somewhat limited," but she assessed the plaintiff's psychomotor status as normal. *Id.* Dr. Doineau diagnosed the plaintiff with Graves' disease, dysthymic disorder, and "[a]voidant and borderline personality disorder traits," and she assessed the plaintiff with a current Global Assessment of Functioning ("GAF") score of 65.[7] (Tr. 246.) In Dr. Doineau's opinion, the plaintiff had no limitations in the areas of understanding, remembering, or adaptability, but had mild to moderate limitations sustaining concentration and persistence as well as moderate limitations interacting socially. (Tr. 247.)

On September 25, 2006, the plaintiff returned to Dr. Bowles and reported having "continued vivid dreams" approximately twice a week. (Tr. 280.) Dr. Bowles noted that the plaintiff was less tearful than before but indicated that he planned to refer the plaintiff for psychiatric treatment. *Id.* On October 31, 2006, the plaintiff complained of continued vivid dreams and weakness in her right leg. (Tr. 279.) Dr. Bowles noted that the plaintiff's palpitations were well-controlled with medication. *Id.* He diagnosed her with Graves' disease, depression, and "malaise/fatigue" in the right lower extremity, and he referred her to a psychiatrist and prescribed Effexor and Seroquel[8] to address her depression. *Id.*

---

[7] The GAF is used to assess the social, occupational, and psychological functioning of adults. A GAF score between 61-70 shows "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (4th ed. 2000) ("DSM-IV-TR").

[8] Seroquel is an antipsychotic used to treat schizophrenia and bipolar disorder. Saunders at 639.

On October 30, 2006, Dr. Rebecca Joslin, Ed.D., a non-examining DDS consultant, completed a Psychiatric Review Technique ("PRT") and a mental Residual Functional Capacity ("RFC") assessment. (Tr. 249-65.) Dr. Joslin opined that the plaintiff had depressive disorder as well as avoidant and borderline personality disorder traits. (Tr. 252, 256.) In the PRT, Dr. Joslin opined that the plaintiff experienced mild restrictions of activities of daily living; moderate difficulties maintaining social functioning, concentration, persistence, and pace; and no episodes of decompensation. (Tr. 259, 261.) In the mental RFC assessment, Dr. Joslin found that the plaintiff "would be able to understand and remember simple and detailed" instructions. (Tr. 263, 265.) However, she opined that the plaintiff was markedly limited in her ability to interact appropriately with the general public, explaining that she was "unable" to do so. (Tr. 264-65.) Dr. Joslin also found that the plaintiff was moderately limited maintaining attention and concentration for extended periods, working in coordination with or proximity to others without distraction, completing a workday and workweek without interruptions from psychologically based symptoms, and getting along with coworkers without distracting them or exhibiting behavioral extremes. (Tr. 263-64.) Dr. Joslin explained, however, that the plaintiff would be able, "with some difficulty," to "maintain attention, concentration, persistence, and pace and be around others without distraction." (Tr. 265.) Similarly, Dr. Joslin opined that the plaintiff would have moderate limitations responding appropriately to changes in the work setting but would be able to adapt to changes "with some difficulty." (Tr. 264-65.)

On December 4, 2006, the plaintiff presented to Dr. Bowles and reported that she was feeling "ok," sleeping "better," and experiencing fewer vivid dreams but that she remained unhappy.

(Tr. 278.)  Dr. Bowles continued to prescribe Effexor and Seroquel and also prescribed Synthroid to address the plaintiff's thyroid problem.[9]  *Id.*

On December 7, 2006, the plaintiff met with Dr. Alexander Prikhojan for an initial psychiatric evaluation.[10]  (Tr. 322-24.)  The plaintiff reported feeling depressed for the past ten years.  (Tr. 322.)  Dr. Prikhojan noted that she was mildly disheveled and her speech was monotonous and slurred, but that her thoughts were concrete.  (Tr. 323.)  He diagnosed the plaintiff with depression "due to hypothyroid" and prescribed Seroquel and Effexor.  (Tr. 324.)  On December 14, 2006, the plaintiff returned to Dr. Prikhojan and reported having "terrifying dreams."  (Tr. 325.)  Dr. Prikhojan noted that the plaintiff's mood appeared "better," and he diagnosed her with post-traumatic stress disorder ("PTSD") and depression.  *Id.*  At a follow-up on December 28, 2006, Dr. Prikhojan noted that the plaintiff's mood was "fair" and her affect "silly," and he assessed her as being fairly stable.  (Tr. 326.)  On January 11, 2007, the plaintiff appeared groomed, "less odd," and presented with a "fuller and more appropriate affect."  (Tr. 327.)  The plaintiff continued treatment with Dr. Prikhojan through 2007 and 2008.  (Tr. 328-35.)  In September 2007, Dr. Prikhojan altered his diagnosis to major depressive disorder with psychosis.  (Tr. 331.)

The plaintiff returned to Dr. Bowles on January 29, 2007, complaining of leg weakness.  (Tr. 277.)  Dr. Bowles noted that she was compliant with medication and feeling better and that her mood was improved.  *Id.*  On April 30, 2007, Dr. Bowles noted that the plaintiff had experienced

---

[9] Synthroid is synthetic thyroid hormone.  Saunders at 678.

[10] The Court made every attempt to decipher the medical evidence of record; however, many of Dr. Prikhojan's handwritten treatment notes are illegible.

improvement with sleep and depression, and he continued to prescribe Effexor and Seroquel. (Tr. 341.)

On May 24, 2007, Dr. James Millis, a nonexamining DDS consultative physician, reviewed the medical evidence and concluded that the plaintiff's physical impairments were not severe. (Tr. 283-86.) Dr. Millis accepted the plaintiff's allegations as credible; however, he concluded that her allegations did not constitute a severe impairment because her heart rate was within normal limits, there was "no evidence of end organ damage," and she had obtained "good results" from treatment. (Tr. 286.)

On June 7, 2007, Dr. Dorothy Lambert, Ph.D., a DDS consultative examiner, completed a psychological examination of the plaintiff. (Tr. 296-300.) The plaintiff reported "[f]eeling tense, nervous[,] and jumpy;" being afraid to leave her home; worrying and crying often; losing weight; isolating herself; being unable to get "bothersome thoughts" out of her mind; tiring easily; and having nightmares, headaches, and mood swings. (Tr. 298.) She related that her medication "helped" her difficulty falling asleep. *Id.* She also reported having symptoms of PTSD from childhood trauma, including "recurrent and intrusive distressing recollections," flashbacks, "diminished interest and participation in significant activities," "feeling[s] of detachment and estrangement from others," "restricted range of affect," difficulty concentrating, hyper-vigilance, and "exaggerated startle response." (Tr. 298-99.)

Dr. Lambert noted that the plaintiff spoke in a "very low childlike voice" during the examination but was otherwise articulate, alert, and cooperative during the interview. (Tr. 297.) She also noted that the plaintiff had no unusual mannerisms other than occasionally pouting like a child.

*Id.* Throughout the interview the plaintiff appeared depressed, and she reported having auditory and visual hallucinations in which her deceased grandmother appeared and talked to her. (Tr. 297-98.) During a mental status examination, the plaintiff demonstrated "fairly poor" concentration, limited vocabulary, and impaired "[a]bstraction ability." (Tr. 298.) Dr. Lambert noted that the plaintiff's "[i]ntellectual functioning appear[ed] to be within the borderline range" and that "her thought processes appeared loose, resembling that of schizophrenia." *Id.* Dr. Lambert diagnosed the plaintiff with "schizoaffective disorder, depressive type, partially controlled by medication;" PTSD; avoidant personality disorder; and "[r]ule out [b]orderline [i]ntellectual [f]unctioning." (Tr. 300.) Dr. Lambert opined that the plaintiff was "moderately impaired in the ability to understand [and] remember short work-like procedures and locations;" "moderately impaired in concentration and persistence;" "slightly impaired in the ability to interact with others;" and "severely impaired in the ability to react to changes." *Id.*

On July 12, 2007, Dr. Dorothy Tucker, Ph.D., a non-examining DDS consultant, reviewed the medical evidence related to the plaintiff's mental impairments and completed a PRT and mental RFC assessment. (Tr. 302-18.) Dr. Tucker concluded that the plaintiff had major depressive disorder, PTSD, and avoidant personality disorder, and she opined that borderline intellectual functioning should be ruled out. (Tr. 303, 305, 307, 309.) In the PRT, Dr. Tucker opined that the plaintiff was markedly limited maintaining concentration, persistence, or pace and moderately limited in activities of daily living and maintaining social functioning. (Tr. 312.) In the RFC assessment, Dr. Tucker included several moderate limitations in the areas of understanding and

memory, sustained concentration and persistence,[11] social interaction, and adaptation. (Tr. 316-17.) Dr. Tucker clarified that the plaintiff would be able to understand and remember instructions for simple and low-level detailed tasks; sustain concentration and persistence for such tasks despite periods of increased signs and symptoms; and experience some, but not substantial, difficulty interacting with the public, supervisors, and co-workers. (Tr. 318.) Dr. Tucker also opined that the plaintiff would be able to set limited goals, adapt to infrequent changes, and would have some, but not substantial, difficulty recognizing hazards. *Id.*

On December 20, 2007, the plaintiff returned to Dr. Bowles for a check-up. (Tr. 339.) The plaintiff denied having any new medical problems and reported feeling "ok" and less fatigued, but Dr. Bowles noted that, although her "emotions [were] improved," she still complained of "some malaise." *Id.* Dr. Bowles continued to prescribe Effexor and Seroquel. *Id.* Nearly a year later, on December 11, 2008, the plaintiff returned to Dr. Bowles with reports of continued social isolation and unstable memory. (Tr. 338.) Dr. Bowles diagnosed her with hypothyroidism status post radioactive iodine therapy, depression, tachyarrhythmia, and dyslipidemia.[12] *Id.* The plaintiff reported that she was taking Effexor but had discontinued Seroquel. *Id.* Dr. Bowles prescribed Synthroid and continued to prescribe Effexor. *Id.*

On December 18, 2008, Dr. Prikhojan completed a form titled "Medical Assessment of Ability to do Work-Related Activities (Mental)." (Tr. 351-53.) Dr. Prikhojan noted that he had

---

[11] Dr. Tucker did not explain why, in the PRT, she indicated that the plaintiff had markedly limited abilities maintaining concentration, persistence, or pace, yet, in the RFC, she found that the plaintiff only had moderate limitations in these areas. (Tr. 312, 316-17.)

[12] Dyslipidemia is a condition characterized by abnormal amounts of lipids in the blood. Dorland's at 575.

treated the plaintiff for "major depressive disorder with psychotic features" and remarked that the plaintiff "remain[ed] symptomatic" with poor attention and concentration, poor ability to relate, and impulsiveness. (Tr. 351.) He opined that the plaintiff had a fair ability to follow work rules, deal with the public, and function independently but poor to no ability to relate to co-workers, use judgment, interact with supervisors, deal with work stresses, or maintain attention and concentration. *Id.* He further opined that the plaintiff was capable of caring for herself but could not tolerate stressors or adapt to a changing environment. *Id.* Dr. Prikhojan opined that the plaintiff had a fair ability to understand, remember, and carry out simple job instructions, but poor to no ability to do so with complex or detailed job instructions. (Tr. 352.) He believed that the plaintiff's difficulty concentrating led to forgetfulness and a need for "repeated explanations of even simple things." *Id.* Dr. Prikhojan also opined that the plaintiff had poor to no ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. *Id.* He also found that the plaintiff "falls asleep at work," potentially as a side effect of her medication; "'snaps' at people, including co-workers;" and "[b]ecomes upset at minimal provocation." *Id.* Finally, Dr. Prikhojan noted that the plaintiff had difficulty managing her finances and appeared to have a low IQ; however, he believed that IQ testing was impossible because of her psychiatric symptoms. (Tr. 353.)


### B. Hearing Testimony

The plaintiff was represented by counsel and testified at a hearing before the ALJ on April 13, 2009. (Tr. 24-37.) She testified that she was thirty-six years old, has a twelfth grade education, and lives with her two children ages sixteen and eighteen years old. (Tr. 28, 31.)

The plaintiff testified that her disabling conditions included depression, Graves' disease, and falling asleep. (Tr. 30.) She testified that she began treatment for depression in 2006 and that she takes Celexa[13] and Seroquel to treat her depression. (Tr. 30, 33.) She testified that her depression makes her feel tired, sometimes makes her want to avoid people, and causes problems with memory, nervousness, concentration, and attention. (Tr. 33.) The plaintiff explained that both her thyroid condition and her medications contributed to her fatigue. (Tr. 31, 34-35.) She relayed, however, that she had been able to reduce her fatigue during the workday by taking her medicine at the end of the day and then going home to sleep, rather than taking her medicine in the morning. (Tr. 35.)

The plaintiff recounted her work in the past fifteen years to include jobs as grocery store cashiers at Kroger and Albertsons, restaurant cashier at San Antonio Taco Company, and machine operator at Hillman Anchor Wire.[14] (Tr. 28-29, 134-38.) She testified that she stopped working full time on July 14, 2005, when she was fired from her job as a machine operator because she fell asleep. (Tr. 29, 34.) Starting approximately two years before the hearing, the plaintiff worked 20-30 hours a week as a grocery store cashier at Save-A-Lot making $7.00 an hour. (Tr. 29-30.) She testified that she lifted over twenty pounds in her job as a cashier but did not do so as a machine operator. (Tr. 29.) She further testified that she performed household chores, cooked "sometimes," washed laundry, drove, shopped "sometimes," and occasionally engaged in social activities such as going to church or visiting family. (Tr. 31-32.)

---

[13] Celexa is a serotonin reuptake inhibitor ("SSRI") prescribed to treat major depressive disorder and PTSD. Saunders at 141-42.

[14] Because of errors in the transcription of the plaintiff's testimony, the Court has also referred to the plaintiff's work history report. (Tr. 134-38.)

# III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on August 19, 2009. (Tr. 15-23.) Based upon the record, the ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.  The claimant has not engaged in substantial gainful activity since July 14, 2005, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

    \*\*\*

3.  The claimant has the following severe impairment: depression (20 CFR 404.1520(c) and 416.920(c)).

    \*\*\*

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

    \*\*\*

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all physical exertional levels. However, the claimant is limited to following simple instructions and performing unskilled work activity.

    \*\*\*

6.  The claimant is capable of performing past relevant work as a cashier or machine operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity. (20 CFR 404.1565 and 416.965).

    \*\*\*

7.  The claimant has not been under a disability, as defined in the Social Security Act, from July 14, 2005, through the date of this decision. (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 17-23.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's

explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-

workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs the plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying her burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B. The Five Step Inquiry**

In this case, the ALJ resolved the plaintiff's claim at step four of the five-step process. At step one, the ALJ determined that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 17.) At step two, the ALJ determined that the plaintiff's depression was a severe impairment and that her Graves' disease was not a severe impairment. (Tr. 18.) At step three, the ALJ determined that the plaintiff's depression did not meet or medically equal the criteria of any listed impairments with particular consideration of Listing 12.04. (Tr. 18-19.) At step four, the ALJ determined that the plaintiff was capable of performing her past relevant work as a cashier or machine operator. (Tr. 22-23.) Having resolved the plaintiff's claim at step four, the ALJ did not proceed to step five.

**C. The Plaintiff's Assertions of Error**

The plaintiff argues that the ALJ erred in finding that her Graves' disease was not a severe impairment. Docket Entry No. 10, at 6. She also contends that the ALJ erred in evaluating the medical opinion evidence. *Id.* at 4-6. Finally, the plaintiff argues that the ALJ erred in finding that she could perform her past relevant work because the ALJ did not properly develop the record and incorrectly categorized the plaintiff's past work as unskilled. *Id.* at 2-4.

**1. The ALJ properly evaluated the severity of the plaintiff's Graves' disease**.

The plaintiff argues that the ALJ erred at step two by finding that Graves' disease was not a severe impairment. Docket Entry No. 10, at 6. The plaintiff testified that Graves' disease caused

her to fall asleep at work and resulted in her being fired from her job as a machine operator. (Tr. 29-31, 34.) The ALJ concluded that the evidence did not show that Graves' disease caused severe symptoms or limitations on work activities. (Tr. 18.)

The plaintiff bears the burden at step two of proving that she suffers from a severe impairment. *Jones*, 336 F.3d at 474. The Regulations provide that an impairment is considered severe if that impairment "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). *See also* 20 C.F.R. § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."). The Regulations define basic work activities as the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). The Sixth Circuit has construed the step two severity determination as a "de minimis" hurdle in the five step sequential process, but it still effectively screens out "claims that are 'totally groundless' solely from a medical standpoint." *Higgs*, 880 F.2d at 862-63 (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89-90 (6th Cir. 1985) and citing *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986)).

Here, the ALJ found that the plaintiff's Graves' disease did "not cause more than minimal limitations in the ability to perform basic work activities." (Tr. 18.) It is the plaintiff's burden to produce evidence in the record of functional limitations from an impairment. 20 C.F.R. §§ 404.1512(c), 416.912(c). Upon Dr. Bowles' direction, the plaintiff received radioactive iodine therapy to treat Graves' disease on June 16, 2006. (Tr. 237.) Nothing in Dr. Bowles' treatment notes after this date indicate that her condition worsened or otherwise caused significant limitations. (Tr. 215, 277-82, 338-48.) Although Dr. Fletcher, a DDS consultative physician, classified the

plaintiff's thyroid condition as severe on September 5, 2006, he expected improvement to non-severe status within twelve months of treatment. (Tr. 239-42.) Indeed, Dr. Millis, a subsequent DDS consultative physician, classified the plaintiff's impairment as non-severe on May 24, 2007, noting that she had obtained "good results" from treatment, had a normal heart rate, and exhibited "no evidence of end organ damage." (Tr. 283-86.) Similarly, although the plaintiff testified that she was fired after she fell asleep at work in July 2005, there is no evidence in the record suggesting that she fell asleep at work after she began receiving treatment in June 2006. (Tr. 29-31, 34, 107, 237.) The plaintiff testified that Graves' disease and the medication prescribed to treat it caused tiredness, but she also testified that she was able to reduce fatigue during the workday by taking her medication at the end of the day. (Tr. 31, 34-35.)

The ALJ relied on this evidence in finding that Graves' disease did not significantly limit the plaintiff's basic work abilities. (Tr. 18.) The evidence in the record supports the ALJ's conclusion in this regard.

### 2. The ALJ properly evaluated the medical opinion evidence.

The plaintiff next argues that the ALJ erred by "disregarding or discrediting the evidence provided by all of the [p]laintiff's treating and examining practitioners." Docket Entry No. 10, at 4. Specifically, she contends that the opinions of Drs. Prikhojan, Lambert, Tucker, and Joslin should have been given more weight. *Id.* at 4-6.

According to the Regulations, the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining

sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[15] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[16] *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th

---

[15] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

[16] Effective March 26, 2012, the numbering for the treating physician rules changed. Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2). *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed.Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[17] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

---

[17] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

Given the regularity with which Dr. Prikhojan examined the plaintiff (tr. 321-35), he is classified as a treating source under 20 C.F.R. §§ 404.1502 and 416.902. The ALJ recognized Dr. Prikhojan as the plaintiff's treating psychiatrist. (Tr. 21.) However, he did not give controlling weight to Dr. Prikhojan's assessment of the plaintiff's psychological limitations, instead giving it only "some, but not great, weight." (Tr. 21, 351-53.)

The ALJ agreed that the plaintiff had "some limitations in the ability to concentrate and the ability to follow complex instructions" and incorporated these limitations into the plaintiff's RFC by limiting her to following simple instructions and performing unskilled work activity. (Tr. 20-21.) However, the ALJ concluded that Dr. Prikhojan's other opinions regarding the plaintiff's limitations were "not substantiated by the evidence of record or the claimant's work history, including the work activity occurring after the alleged onset date." (Tr. 21.) The ALJ noted that the plaintiff had been working part time for approximately two years prior to the hearing. *Id.* Although this work did not rise to the level of substantial gainful activity, the ALJ found that it was inconsistent with the level of impairment described by Dr. Prikhojan. *Id.* The ALJ also found that some of the restrictions in Dr. Prikhojan's opinion were inconsistent with the plaintiff's reported daily activities, which included work activity, attendance at church, shopping, visiting family, and involvement with her children's school activities. *Id.*

Similarly, the ALJ explained the reasons for the weight that she allocated to the opinions of the DDS examining consultative physicians, Drs. Lambert and Doineau. (Tr. 21-22.) The ALJ gave the greatest weight to the opinion of Dr. Lambert, who opined that the plaintiff would be "moderately impaired in the ability to understand and remember short work-like procedures and locations," "moderately impaired in concentration and persistence," and slightly impaired in the

ability to interact with others. (Tr. 22, 300.) However, the ALJ gave little weight to Dr. Lambert's opinion that the plaintiff would be severely impaired in her ability to react to changes because it was not supported by the evidence. (Tr. 22.) The ALJ also gave some weight to the opinion of Dr. Doineau, who opined that the plaintiff would be moderately limited in sustaining concentration and persistence, because the ALJ concluded that these limitations were consistent with the other evidence of record. (Tr. 22, 247.) Here again, the ALJ declined to include a limitation regarding social interaction due to the plaintiff's part-time work as a cashier after the alleged disability onset date. (Tr. 22.)

The ALJ also addressed the opinions of the DDS nonexamining consultive evaluators, Drs. Joslin and Tucker. (Tr. 21-22.) The ALJ gave some weight to their opinions, finding them to be "generally consistent with the totality of the evidence." *Id.* The ALJ accepted some of the limitations found in Dr. Joslin's and Dr. Tucker's RFC assessments, but did not adopt Dr. Joslin's opinion that the plaintiff would be unable to interact appropriately with the public nor Dr. Tucker's opinion that the plaintiff would have trouble interacting with the public and recognizing hazards.[18] *Id.* The ALJ did not further explain her reasoning for declining to adopt Dr. Tucker's opinion regarding the plaintiff's difficulty recognizing hazards except to imply that it was inconsistent with the record. (Tr. 22.) In rejecting both consultative evaluators' opinions that the plaintiff would have difficulty interacting with the public, the ALJ reasoned that "the [plaintiff's] work activity as a cashier necessarily involves interacting with the public." (Tr. 21-22.)

---

[18] Elsewhere in her decision, the ALJ noted that Drs. Joslin and Tucker, who each reviewed the plaintiff's medical records and completed PRTs and RFCs in October 2006, and July 2007, respectively (tr. 249-65, 302-18), "did not have the benefit of more recent evidence, including the [plaintiff's] ability to work and maintain employment as a cashier for the past two years." (Tr. 19.)

The plaintiff argues that the "primary reason given by the ALJ for ignoring the opinions of all the experts is that the claimant was able to perform a part-time job." Docket Entry No. 10, at 5. The Court agrees that the ALJ placed a significant amount of importance on the plaintiff's part-time work as a cashier after the alleged onset date. However, the ALJ did not "ignore" the opinions of the treating and consultative sources. Rather, in weighing the consistency of these medical opinions with the record as a whole, the ALJ reasonably concluded that some of the more severe restrictions were contradicted by the plaintiff's demonstrated ability to meet the demands of her work as a part-time cashier. The ALJ in fact accepted many of the limitations recommended by both Dr. Prikhojan and the DDS consultative doctors in finding that the plaintiff was limited to unskilled work involving simple instructions. However, the ALJ concluded that other more significant limitations were inconsistent with the plaintiff's work activity and activities of daily living. For example, Dr. Prikhojan opined that the plaintiff would have poor to no ability to relate to co-workers, interact with supervisors, maintain attention and concentration, behave in an emotionally stable manner, demonstrate reliability, and tolerate stressors or adapt to a changing environment. (Tr. 351-53.) Similarly, Dr. Joslin concluded that the plaintiff would be unable to interact appropriately with the general public (tr. 265), and Dr. Lambert opined that the plaintiff was severely impaired in her ability to react to changes. (Tr. 300.) However, as the ALJ noted, each of these alleged limitations is undermined by the fact that, for almost two years after her alleged onset date, the plaintiff was able to maintain employment, albeit on a part-time basis. In the ALJ's view, the severity of mental

limitations suggested by Dr. Prikhojan and the consultative examiners was inconsistent with the abilities that the plaintiff had demonstrated in maintaining a part-time job.[19]

The ALJ did not err in evaluating the opinion evidence.[20] The ALJ adequately discussed the reasons that she assigned Dr. Prikhojan's medical opinion less than controlling weight and the reasons for the weight that she gave each of the DDS consultants' opinions. Focusing on the factor of inconsistency with the overall record, the ALJ provided "good reasons" for giving only some weight to Dr. Prikhojan's opinion and appropriately considered the opinions of the consulting and examining sources. There is substantial evidence in the record to support her assessment of the medical opinion evidence.

### 3. The ALJ improperly determined that the plaintiff could perform her past relevant work.

The plaintiff challenges the ALJ's conclusion that she could perform her past relevant work as a cashier or machine operator. Docket Entry No. 10, at 2-4. Specifically, she argues that the ALJ did not properly develop the record regarding her past relevant work in accordance with Social Security Ruling 82-62. *Id.* at 2. She also argues that the ALJ improperly categorized her past

---

[19] In her summation, the ALJ also referred to "the lack of more substantial psychiatric treatment and/or medications" as a factor supporting her assessment of the plaintiff's RFC. (Tr. 22.)

[20] The record also contains a Medical Assessment of Ability to Do Work-Related Activities (Mental) from Dr. Heidi Kilimanjaro-Davis, a psychiatrist, dated February 11, 2010. (Tr. 354-56.) This assessment was completed and submitted to the Appeals Council after the ALJ's decision. (Tr. 2.) The Appeals Council considered the assessment but concluded that it pertained to a time after the ALJ's decision. *Id.* The plaintiff has not raised this issue or addressed Dr. Kilimanjaro-Davis's assessment in her brief. In any event, this Court's review is limited to the record before the ALJ at the time she rendered a decision. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Hammond v. Apfel*, 211 F.3d 1269, 2000 WL 420680, at *6 (6th Cir. Apr. 12, 2000).

relevant work as unskilled and did so without using a vocational expert or referencing specific DOT listings. *Id.* at 3-4.

It remains the plaintiff's burden at step four to prove that she is incapable of performing her past relevant work. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). When determining whether a plaintiff's RFC allows her to perform her past relevant work, an ALJ may obtain evidence about the requirements of that work from many sources. For example, the ALJ may ask the plaintiff about the requirements of her past work or may "ask other people who know about [the plaintiff's] work." 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). The ALJ may also consult vocational experts, the Dictionary of Occupational Titles ("DOT"), or other sources to determine "the physical and mental demands of a [plaintiff's] past relevant work, either as the [plaintiff] actually performed it or as generally performed in the national economy." *Id.* The ALJ's decision "must explain why the [plaintiff] can perform the demands and duties of the past job as actually performed or as ordinarily required by employers throughout the national economy." *D'Angelo v. Comm'r of Soc. Sec.*, 475 F. Supp. 2d 716, 723-24 (W.D. Mich. 2007) (citing *Studaway v. Sec'y of Health and Human Servs.*, 815 F.2d 1074, 1076 (6th Cir. 1987)). *See also* 20 C.F.R. § 404.1520(f) ("[W]e will compare your residual functional capacity . . . with the physical and mental demands of your past relevant work."). In order to adequately explain her rationale for concluding that the plaintiff can perform her past relevant work, it remains "the ALJ's responsibility to ensure that the record is sufficiently developed to support a reasoned determination as to the demands of [the plaintiff's] past relevant work and [the plaintiff's] ability to meet those demands." *Johnson v. Astrue*, 2009 WL 2168671, at * 11 (E.D. Tenn. July 17, 2009), adopting Report and Recommendation entered June 23, 2009 (citing 20 C.F.R. §404.1560(b)(2), Soc. Sec. Rul. 82-62).

The plaintiff argues that the ALJ did not follow Social Security Ruling 82-62, which provides "detailed guidance regarding the evaluation and explanation of the demands of a [plaintiff's] past relevant work ["PRW"] and a [plaintiff's] ability to meet those demands." *Id.* In relevant part, Social Security Ruling 82-62 provides as follows:

> The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.

> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

> Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).

Soc. Sec. Rul 82-62, 1982 WL 31386, at *3 . Further, Ruling 82-62 provides that the ALJ's decision must contain three specific findings of fact: (1) "[a] finding of fact as to the individual's RFC;" (2) "[a] finding of fact as to the physical and mental demands of the past job/occupation;" and (3) "[a] finding of fact that the individual's RFC would permit a return to his or her past job or occupation." *Id.*

In this case, the plaintiff completed disability and work history reports providing a summary of her work history. (Tr. 106-12, 134-41.) In these reports, the plaintiff indicated that she previously

held jobs as a cashier at the grocery stores Kroger and Albertsons, as a cashier at the restaurant San Antonio Taco Company, and as a machine operator at Hillman Anchor Wire.[21]  (Tr. 28-29, 107-08, 134-38.)  The plaintiff indicated that her cashier jobs at Kroger and Albertsons involved using technical knowledge or skills, but did not involve writing or completing reports.  (Tr. 135-36.)  She indicated that her job at Albertsons required using machines, tools, or equipment (tr. 136), and it appears that she indicated the same for her job at Kroger.[22]  (Tr. 135.)  She reported that her job as a cashier at San Antonio Taco Company also involved the use of machines, tools, or equipment but did not involve writing or completing of reports.  (Tr. 138.)  Although it is somewhat unclear, it appears that she marked that she did not use technical knowledge or skills in her job at San Antonio Taco Company.[23]  *Id.*  In her work history report, she described her job at Hillman Anchor Wire as "machine opp" [*sic*] and "assembly lane" [*sic*].  (Tr. 137.)  In her disability report, she explained that her job was to "set up machine for day production, catch product when it came off the line."  (Tr. 108.)  She indicated that, in this job, she used machines tools or equipment but did not use technical knowledge or skills and did not write or complete reports.  (Tr. 108, 137.)

At the hearing, the ALJ elicited only that the plaintiff had worked as a cashier and machine operator at these companies and that she had lifted over twenty pounds as a cashier but not as a

[21] In these reports, the plaintiff also described the exertional requirements of each of her jobs.  (Tr. 107-08, 134-38.)  However, because the ALJ found that the plaintiff had no exertional limitations, the exertional requirements of the plaintiff's past relevant work are not at issue.

[22] On the work history report form, it is somewhat unclear whether the plaintiff used machines, tools, or equipment at Kroger.  She apparently marked boxes for "YES" and "NO" and then scratched out the mark for "NO."  (Tr. 135.)

[23] Here again, when indicating whether she used technical knowledge or skills, the plaintiff marked boxes for "YES" and "NO," but it appears that she scratched out the mark for "YES."  (Tr. 138.)

machine operator. (Tr. 28-29.) The plaintiff's attorney did not ask any questions regarding the

plaintiff's work history. (Tr. 32-36.) The ALJ did not utilize the services of a VE. Consequently,

the information cited above essentially constitutes the sum total of the evidence regarding the

functional requirements of the plaintiff's past work.

In her decision, the ALJ concluded that the plaintiff could perform her past relevant work as

a cashier or machine operator:

> From a review of the Dictionary of Occupational Titles' classifications of a cashier
> and machine operator, the undersigned finds that as those positions are generally
> performed, and as the claimant actually performed that work, the cashier and machine
> operator position would involve unskilled work, consisting of a specific vocational
> preparation (SVP) level of 2 or less.
>
> Unskilled work is work which needs little or no judgment to do simple duties that can
> be learned on the job in a short period of time. For example, a job is unskilled if the
> primary work duties including [sic] handling, feeding, and offbearing (i.e. placing or
> removing materials from machines which are automatic or operated by others), or
> machine tending, a person can usually learn to do the job in 30 days, and little
> specific vocational preparation and judgment are needed. (20 CFR 404.1568 and
> 416.968). Basic mental demands of competitive, remunerative, unskilled work
> include the abilities (on a sustained basis) to understand, carry out, and remember
> simple instructions; to respond appropriately to supervision, coworkers, and usual
> work situations; and to deal with changes in a routine work setting. (SSR 85-15).
> As the undersigned has described the claimant's residual functional capacity, the
> claimant has the ability to perform unskilled work, including the ability to follow
> simple instructions.
>
> In comparing the claimant's residual functional capacity with the physical and mental
> demands of this work, the undersigned finds that the claimant is able to perform her
> past relevant work as it is actually and generally performed. Both of the prior
> occupations of the claimant's past relevant work are unskilled work, and the claimant
> retains the ability to perform unskilled work.

(Tr. 22-23.)

The ALJ's conclusion that the plaintiff can perform her past relevant work is flawed in

several respects. First, the ALJ failed to properly develop the record regarding the demands of the

plaintiff's past relevant work as required by Social Security Ruling 82-62. The ALJ's questioning of the plaintiff at the hearing regarding her past jobs was insufficient, eliciting only the generic job names (i.e., "cashier" and "machine operator"), the names of her employers, and the lifting requirements for each job. (Tr. 28-29.) Considering that the plaintiff's limitations are nonexertional, this questioning wholly fails to provide a basis for determining the nature of the plaintiff's prior work and whether her current limitations are compatible with that work. Although the plaintiff bears the burden of proving that she is unable to perform her past relevant work, *Walters*, 127 F.3d at 529, in order to explain why the plaintiff can perform her past relevant work, the ALJ must have sufficiently developed the record "to support a reasoned determination as to the demands of [the plaintiff's] past relevant work and [the plaintiff's] ability to meet those demands." *Johnson*, 2009 WL 2168671, at * 11. The record here is devoid of evidence regarding the specific demands of the plaintiff's past work. The defendant points to evidence contained in the plaintiff's disability and work history reports. Docket Entry No. 11, at 15-16. However, these reports contain inconsistencies[24] and are so vague that they are unhelpful. (Tr. 107-08, 134-38.) The reports contain, at best, less than a sentence describing what the plaintiff actually did at a particular job. Standing alone, these reports do not provide sufficient support for the ALJ to make a "reasoned determination" that the plaintiff is able to perform her past relevant work. *See Johnson*, 2009 WL 2168671, at *11. *See also* Soc. Sec. Rul. 82-62. Moreover, there is no indication that the ALJ relied on this evidence in reaching her decision.

---

[24] *See* nn.22 & 23 *supra*. Although exertional requirements are not at issue, the Court also notes that the plaintiff inconsistently filled out the portion of her work history report pertaining to lifting requirements. For example, for her machine operator job, the plaintiff inconsistently reported that, while the heaviest weight she lifted was ten pounds, she frequently lifted twenty-five pounds (tr. 137), and at the hearing, she testified that she did not lift over twenty pounds. (Tr. 29.)

The ALJ's decision is also flawed because it is unclear which jobs the ALJ found that the plaintiff was able to do. The ALJ did not use a VE and referred only generally to the DOT in finding that the plaintiff's past jobs, as she actually performed them and as generally performed, were unskilled positions with Specific Vocational Preparation ("SVP") levels of two or less.[25] (Tr. 22-23.) The ALJ was not required to use a VE at step four, *see* 20 C.F.R. § 404.1560(b)(2); *Parker v. Sec. of Health & Human Servs.*, 935 F.2d 270, 1991 WL 100547 at *3 (6th Cir. June 11, 1991), and was permitted to refer to the DOT to obtain evidence that the plaintiff could perform her past relevant work. *See* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). *See also* Soc. Sec. Rul. 82-61, 1982 WL 31387, at *2 (the DOT can be relied upon to define a job as it is usually performed in the national economy); Soc. Sec. Rul. 00-4p, 2000 WL 1898704, at *2 (the Social Security Administration relies primarily on the DOT for information about the requirements of work in the national economy). However, because the ALJ did not obtain VE testimony and did not cite to specific DOT listings for the jobs of "cashier" and "machine operator," it is unclear which jobs the ALJ found the plaintiff was able to perform and what level of skill, training, and mental competency those jobs require.

The ALJ characterized the jobs of cashier and machine operator as unskilled having SVP levels of two or less. (Tr. 22-23.) According to the skill level definitions found in 20 C.F.R. §§ 404.1568 and 416.968, unskilled work corresponds to an SVP level of 1-2, and semi-skilled work corresponds to an SVP level of 3-4. Soc. Sec. Rul. 00-4p, 2000 WL 1898704, at *3. The plaintiff

---

[25] The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't of Labor, DOT 1009 (4th ed. rev. 1991). It is measured on a scale from 1–9 on which the higher number assigned to a job, the greater the skill that is required to perform that job. *Id.* Unskilled work has an SVP level of 1–2 and is classified as work that requires "[a]nything beyond short demonstration up to and including 1 month." *Id.*

points out that Section 211.462-014 of the DOT identifies "cashier checker (retail trade)" as having

an SVP level of 3, indicating semi-skilled work. Docket Entry No. 10, at 3-4; U.S. Dep't. of Labor,

DOT 183 (4th ed. rev. 1991). However, the defendant maintains that the plaintiff's past work more

closely aligns with DOT listing 211.462-010, for "cashier II (clerical)." Docket Entry No. 11, at 15-

16; DOT at 183. Although the ALJ was not required to cite to specific DOT listings, the lack of

citations to the DOT makes it impossible to determine which job the ALJ believed the plaintiff was

able to perform. Compounding matters, the ALJ failed to differentiate between the plaintiff's job

as a grocery store cashier and her job as a restaurant cashier, which presumably entailed different

responsibilities.

Similarly, the ALJ concluded that the plaintiff was able to work as a machine operator, which

the ALJ concluded was an unskilled job, again without referencing a specific DOT listing. (Tr. 22-

23.) The plaintiff directs the Court to DOT listing 616.380-018 for "Machine Operator I (any

industry)" which has an SVP of 6.[26] Docket Entry No. 10, at 4; DOT at 548. The defendant argues

that the plaintiff's work as a machine operator does not match that listing, which "includes a number

of obviously skilled tasks such as reading and interpreting blueprints and engineering specifications,"

and instead argues that the plaintiff's work as a machine operator more closely matches DOT listing

706.687-010 for "Production Assembler." Docket Entry No. 11, at 16; DOT at 695. The Court is

disinclined to find that the ALJ *meant* that the plaintiff's past relevant work was as a production

assembler when the ALJ plainly stated that it was as a machine operator. If the ALJ intended to find

---

[26] An SVP of 5-9 corresponds with skilled work. Soc. Sec. Rul. 00-4p.

that the plaintiff's job as a machine operator was in fact a production assembly job, she could have done so.[27]

The lack of clarity in the ALJ's decision is a result of the lack of evidence regarding the plaintiff's past relevant work. The ALJ must have some basis for determining that the plaintiff was able to perform her past jobs as they are generally performed in the national economy. However, because the ALJ did not utilize VE testimony and did not cite with specificity to particular occupations in the DOT, the record does not contain any information regarding how the plaintiff's jobs are generally performed. The ALJ concluded that they are unskilled positions, but there is no support in the record for this conclusion. Similarly, the ALJ must have some basis for determining that the plaintiff could return to her past jobs as she actually performed them. Yet, there is simply not enough evidence in the record to reasonably determine the actual nonexertional demands of the plaintiff's past work. The ALJ took no testimony regarding the specific job functions or mental requirements of the plaintiff's past work. The plaintiff indicated in her disability report that her job as a machine operator was to "set up machine for day production, catch product when it came off the line" and that it did not involve technical knowledge or skills. (Tr. 108.) Elsewhere she described her job as "machine opp" [*sic*] and "assembly lane" [*sic*]. (Tr. 137.) These statements

---

[27] In 2007, a DDS vocational examiner identified the plaintiff's past relevant work as "production assembler" under DOT listing 706.687-010. (Tr. 160.) It is not clear why the examiner described her past job as a "production assembler" and, curiously, the examiner noted that the plaintiff had held this employment for four years, even though the plaintiff indicated in her work history report that she worked at Hillman Anchor Wire from 1999-2005. (Tr. 134.) The defendant argues that this report supports a finding that the plaintiff's past relevant work was as a production assembler. The Court disagrees. The ALJ did not reference this report in her decision, and, more importantly, did not find that the job the plaintiff described as a machine operator was in fact a production assembler job. The defendant is arguing that evidence in the record supports a finding that the ALJ did not make.

alone do not justify the ALJ's findings regarding the skill level necessary to do this work.[28]  The record does not contain even this basic description for the cashier jobs.  (Tr. 135-36, 138.)

Finally, the ALJ's decision is flawed because it does not provide an adequate explanation as to why, given the plaintiff's RFC and the demands of her past work, she is able to perform that work. In order to support a finding that the plaintiff can perform her past relevant work, the ALJ must "explain *why* the [plaintiff] can perform the demands and duties" of her past work.  *See D'Angelo*, 475 F. Supp. 2d at 723-24 (emphasis added).  *See also Johnson*, 2009 WL 2168671, at *12.  Social Security Ruling 82-62 requires an ALJ to make findings of fact as to the plaintiff's RFC, the physical and mental demands of her past work, and whether the plaintiff's RFC "would permit a return to . . . her past job or occupation." 1982 WL 31386, at *4.  Although "[t]he ALJ need not discuss every aspect of the record or explain every finding at length [she] must 'articulate with specificity reasons for the findings and conclusions that . . . she makes' to facilitate meaningful judicial review." *Wright v. Astrue*, 2009 WL 890051, at *1 (E.D. Tenn. March 26, 2009), adopting Report and Recommendation,  and quoting *Bailey v. Comm'r of Soc. Sec.*, 1999 WL 96920, at *4 (6th Cir. Feb. 2, 1999).

The ALJ's explanation only addressed the plaintiff's past work in a general, conclusory way. The ALJ found that the plaintiff's past jobs as cashier and machine operator involved unskilled work and cited the regulatory definition of unskilled work.  (Tr. 22-23.)  The ALJ concluded that "[i]n comparing the [plaintiff's] residual functional capacity with the physical and mental demands of this work, the undersigned finds that the [plaintiff] is able to perform her past relevant work as it is

---

[28] Moreover, as noted above, there is no indication that the ALJ relied on the disability or work history reports when finding that the plaintiff could perform her past relevant work.

actually and generally performed." (Tr. 23.)   This explanation is superficial and, given the deficiencies addressed above, inadequate.   Without the testimony of a VE and without specific references to the DOT, the record does not contain sufficient evidence about how the plaintiff's past relevant jobs are generally performed in the national economy.   Likewise, the record lacks evidence as to how the plaintiff actually performed these jobs.   Because the record is underdeveloped, the ALJ's explanation is also lacking.   The ALJ's conclusory explanation does not cite any supporting evidence and fails to set forth the demands of the plaintiff's past work with sufficient specificity to enable review.   Further, the ALJ's decision does not adequately explain with any substance how, given the plaintiff's RFC, she would be able to perform these past jobs.

Given these deficiencies, the ALJ's decision at step four that the plaintiff can return to her past relevant work is not supported by substantial evidence.   Because the ALJ did not perform an alternative step-five analysis, the ALJ's decision should be reversed and the case remanded.   On remand, the ALJ should develop the record such that she is able to determine and make specific findings regarding the functional requirements of the plaintiff's past work and the plaintiff's ability to meet the demands of her past work given her RFC.

## V.  RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 9) be GRANTED to the extent that the case should be remanded to the ALJ to properly determine whether the plaintiff is capable of performing her past relevant work.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*. 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge